IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

STEVE GIBSON,
       Plaintiff,

vs.                                  Case No.: 5:11cv313/MMP/EMT

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,
       Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

On March 13, 2006, Steve Gibson (henceforth "Plaintiff" or "claimant") filed an application for DIB, and he alleged therein disability beginning August 31, 1997 (tr. 13).[1]  His application was denied initially and on reconsideration, and Plaintiff then requested a hearing before an administrative law judge ("ALJ").  On October 30, 2008, following a hearing, an ALJ found that Plaintiff was "not disabled" as defined under the Act through December 31, 2003, Plaintiff's date

_____

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on December 13, 2011 (doc. 7).  Moreover, the page numbers refer to those found on the upper right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

last insured (tr. 71–78).  On June 19, 2009, the Appeals Council ("AC") remanded Plaintiff's case to the ALJ to consider additional evidence (that is, "mental health records covering a significant portion of the  period at issue") and to obtain medical expert testimony from a psychiatrist regarding the nature and severity of Plaintiff's impairments and whether any such impairment met or equaled a listed impairment (tr. 62–64).  On April 19, 2010, after considering the additional evidence and obtaining expert testimony as directed by the AC, the ALJ found Plaintiff "not disabled" through his date last insured (tr. 13–20).  On July 21, 2011, the AC denied Plaintiff's request for review (tr. 4–6).  Thus, the ALJ's decision dated April 19, 2010, stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

II.     FINDINGS OF THE ALJ

On April 19, 2010, the ALJ made several findings relative to the issues raised in this appeal (tr. 13–20):

1)     Plaintiff last met the insured status requirements of the Act on December 31, 2003.

2)     Plaintiff did not engage in substantial gainful activity during the time frame relevant to this appeal, that is, from August 31, 1997 (date of alleged onset) through December 31, 2003 (date last insured).

3)     Plaintiff had the following severe impairments: personality disorder and asthma.

4)     Plaintiff had no impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5)     Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b),[2] except he was limited to only occasional contact with the public.

6)     Plaintiff could have performed his past relevant work as a dispatcher and security systems installer; alternatively, Plaintiff could have performed other work available in the national economy, including office helper, housekeeper, and assembler. Plaintiff, therefore, was not disabled between August 31, 1997, and December 31, 2003.

III.    STANDARD OF REVIEW

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL AND MEDICA/PSYCHIATRIC HISTORY

A.      Personal History

Plaintiff was born on November 4, 1971, and thus was thirty-two years of age on the date he was last insured (tr. 19).  Plaintiff attended regular classes in high school, completed high school (or its equivalent), and attended college for one year (see tr. 19, 176).  Thereafter, he served in the United States Marine Corps ("USMC") from March 1993 through July 1995 and trained for work as a police dispatcher and corrections officer (tr. 161, 176).  Plaintiff worked as correctional specialist in the USMC and, as such, supervised prisoners and carried out daily brig operations (tr. 165).  At the time Plaintiff applied for DIB in March 2006, he was incarcerated in the Florida Department of Corrections ("DOC") (tr. 159).  In connection with his DIB application he reported he had received treatment in the DOC for mental disorders since January 2001 and, further, that he

previously received such treatment at a Veterans Administration ("VA") hospital from approximately 1997 through 2000 (tr. 160).

B.    Relevant Medical and Psychiatric History

Before briefly outlining Plaintiff's medical and psychiatric history, the court addresses the manner in which Plaintiff, through his counsel, was directed to prepare a memorandum in support of his complaint and the manner in which he responded.  In the court's Scheduling Order, issued December 20, 2011, the court directed Plaintiff to "file and serve a brief setting forth concisely the basis for the . . . reversal of the final decision of the Commissioner and a detailed analysis of the administrative record, with citation . . . to the administrative record" (doc. 8 at 1) (emphasis in original).  The court further directed Plaintiff to "specifically cite the record by page number for factual contentions" and clearly warned that failure "to support factual contentions with accurate, precise citations to the record will result in the contention(s) being disregarded for lack of proper development" (id., emphases in original).  The administrative record in this case is unusually lengthy, consisting of a total of 1758 pages, approximately 1400 of which are medical records. Despite the court's clear instructions that in his memorandum he must cite the record by page number for factual contentions—an instruction of particular, critical importance in a case with a record as massive as the one here—Plaintiff cited only sixteen pages in the entire record, eight of which are portions of the ALJ's opinion dated April 19, 2010 (tr. 13–20) and eight of which are portions of the transcript of Plaintiff's second administrative hearing before the ALJ, held March 18, 2010 (see doc. 13 at 6–8 (citing tr. 1667, 1669, 1677–78, 1684–85, 1687, 1689)).[3]  Plaintiff made no citations to the medical records, although he stated that "[fo]r the sake of brevity and economy, the statements of the testimony and of the documentary evidence as set forth in the ALJ's decision [dated April 19, 2010] are accepted by the Plaintiff and incorporated, as if fully presented herein . . . ." (doc. 13 at 3) (citation to transcript omitted).

Thus, consistent with its clear instructions in the Scheduling Order, the court primarily focuses its outline of Plaintiff's medical/psychiatric history and its substantive review of this appeal on the portions of the record identified by the parties.  Nonetheless, in order to present a backdrop

---

[3] The Commissioner was given the same instruction (see doc. 8), and he complied by identifying specific portions of the record in support of his arguments (see doc. 16).

for Plaintiff's legal argument that the ALJ erred in determining his RFC and in discounting certain

of his subjective complaints, the court also briefly discusses other relevant medical evidence, below,

as the ALJ has presented it in both of his decisions.[4]

### Relevant Excerpts from the ALJ's First Decision (tr. 71–78)

On February 10, 2000, Dr. David Smith, Ph.D., completed a court-ordered psychological competency evaluation report. Dr. Smith is a licensed psychologist with Life Management Center, and his report was for use by a Florida Circuit Court judge prior to ordering the claimant to trial. Dr. Smith noted that [Plaintiff] had a two year history of treatment through Life Management. He had been diagnosed with generalized anxiety and depressive disorders. He was prescribed Zoloft, Depakote and Haldol and had begun counseling. He had been admitted to another institution with a possible lithium overdose in 1999. He was also diagnosed with a bipolar disorder by another doctor. There was also a history of alcohol abuse. He had been described as manipulative. On presentation, the claimant was fully oriented, but reported mood swings, complained of a dysphoric mood, hypersomnia, worry, frustration and feelings of helplessness and hopelessness. He denied suicidal ideation. Dr. Smith reported that the claimant had obtained a full-scale IQ score of 90, which placed him in the lower limits of average intellectual functioning. The claimant admitted to finding his wife in bed with another man and to causing injury to that individual. His exhibited good recall and understanding of the events. There was also a pending marijuana charge. Dr. Smith concluded that the claimant's mood swings were mild and that he was aware of the facts and could assist his attorney. In other words, he was found to have been competent to stand trial (Exhibit 1F [tr. 215–18]).

The claimant was evaluated through the emergency room at Bay Medical Behavioral Health Center on September 1, 2000 after two attempts to commit suicide in the city jail following his arrest for failure to pay a fine. He attempted to hang himself with his clothing and tried to cut his wrists with a plastic cup. He then struck himself in the forehead with his handcuffs. He complained of feeling manic lately and admitted previous attempts to overdose in the remote past. Dr. D. Heape, M.D., cleared the claimant for admission. The doctor stated a diagnosis that included 1. suicide attempt, 2. arm abrasions, 3. forehead abrasions, and 4. bipolar, poorly controlled (Exhibit 3F/3–4 [tr. 231–32]). A discharge note dated September 25, 2000 reflects the claimant had been admitted two days before. It was noted that he had been hospitalized at Gulf Pines, but had walked away when he felt his needs were not being met. He presented on this occasion due to violent acting out in the local ER

---

[4] The ALJ's first decision, dated October 30, 2008, is found at transcript pages 71–78. His second decision, dated April 19, 2010, is found at transcript pages 13–20. In his second decision, the ALJ adopted and incorporated by reference "the medical analysis, [Plaintiff's] testimony and [evidentiary] summary" set forth in the first decision (tr. 17). Thus, although not noted by Plaintiff in his memorandum, ALJ's first decision must also be considered in determining whether the Commissioner's final decision under review here should be affirmed.

when he demanded benzodiazepines.  He was admitted and placed on psychotropic medications.  He improved significantly in his self-care as well as impulse control. He wrote a letter of apology regarding his behavior in the emergency room, was told to continue Depakote and Zoloft and was discharged (Exhibit 3F/1–2 [tr. 229–30]).

The claimant testified [at his first administrative hearing before the ALJ, held September 8, 2008] that he was incarcerated from January 2001 to April 2007.  A Florida Department of Corrections record dated February 2, 2001 reflects that the claimant complained of asthma and that a[] chest x-ray was interpreted by Dr. E. E. Franco, M.D., as having revealed, "There is no evidence of mediastinal or hilar adenopathy.  The heart is within normal limits.  The lungs are clear and there is no evidence of pleural effusion.  The thorax is intact. (Exhibit 7F/5 [tr. 584]).  A February 4, 2003 record reflects that the claimant continued to complain of asthma and that he was using an Albuterol inhaler.  His blood pressure was 160/92.  It was also noted that he was a 1 pack per day smoker.  He was told to quit smoking, change his diet and increase his exercise to obtain a healthier life style.  He was treated with Prozac 20 mg, Geodan 40 mg, Depakote 250 mg, Qvar 40 mg and Albuterol (Exhibit 7F/158, 104–106 [tr. 739, 684–86]).  A progress note from February 13, 2003 states the claimant had been diagnosed with bipolar disorder and that he was being treated with Depakote 250 mg. (Exhibit 7F/161 [tr. 742]).  In April he complained of back pain and occasional shortness of breath, which he reported was relieved with Albuterol, as well as dizziness and anxiety.  It was noted that he continued to smoke and was again told to cease.  He was told to do back exercises.  He was provided with Ibuprofen 400 mg for back pain (Exhibit 7F/117 [tr. 697]).

On October 27, 2003, the claimant reported urinary incontinence at night and it appears that a referral was made (Exhibit 7F/150–151 [tr. 731–32]).

Relevant Information Derived from the ALJ's Second Decision and the Transcript of Plaintiff's Second Administrative Hearing, held March 18, 2010.

As previously noted, in his second decision—the decision that stands as the final decision of the Commissioner—the ALJ incorporated by reference the evidence as summarized in his first decision.  Additionally, the ALJ noted he had complied with the AC's directive by considering additional evidence as to Plaintiff's mental status and by soliciting testimony from a psychiatric expert (tr. 13).[5]  The ALJ then summarized Plaintiff's testimony, as well as the testimony of Ronald Spitznagel, a vocational expert ("VE"), and Alfred G. Jonas, M.D., a psychiatrist, who testified as a medical expert ("ME") (tr. 17–19).

_____

[5] The ALJ's consideration of the additional medical evidence is not at issue in this appeal and thus is not further discussed.

Case No. 5:11cv313/MMP/EMT

As noted by the ALJ, Plaintiff testified about his work history and occasional inability to arrive at work on time due to insomnia (tr. 17). More specifically, Plaintiff estimated that on average he previously missed two days of work per month due to insomnia-related problems (tr. 1677). He stated he once lost a job "because [he] couldn't show up every morning" (*id.*). Plaintiff described his absenteeism or tardiness as "hit or miss," noting that it turned on whether he was unable to sleep or had experienced irregular sleep patterns (tr. 1678–79). It appears that at the time of Plaintiff's second hearing the VA may have been attempting to adjust his medications to improve his insomnia and/or sleep apnea (*see* tr. 17, 1679), although Plaintiff testified he was not being treated for his sleep apnea and noted he had an appointment at the VA "like, two years ago" for the sleep apnea but missed the appointment due to transportation difficulties and "never got another appointment" (tr. 1679–80). Finally, Plaintiff testified he did not use a Continuous Positive Airway Pressure device ("CPAP") and that one had never been prescribed for him (tr. 1680).

The ALJ also described relevant portions of the testimony of Mr. Spitznagel, the VE (tr. 19–20). In brief, the VE characterized Plaintiff's past relevant work as a radio dispatcher as sedentary, and as a security/electrical systems installer and USMC corrections officer as medium (*see* tr. 1672). The VE then opined, when asked to consider a limitation to "only occasional contact with the public," that Plaintiff could return to his past work as either a radio dispatcher or systems installer (tr. 19, 1684–85). He also opined that Plaintiff could perform other jobs with the same limitation, including surveillance systems monitor, office helper, cleaner, housekeeper, or assembler (tr. 1685). The VE further opined, essentially, that if Plaintiff consistently failed to report to work on time, missed more than two days of work per month, or took more than a total of forty-five minutes in unscheduled breaks in a workday, he could not maintain employment (*see* tr. 1686–87, 1689). Lastly, the VE was asked whether Plaintiff could work in a position involving "occasional interaction with coworkers and supervisors" (tr. 1687). The VE opined that—assuming this was indeed a necessary and appropriate limitation—Plaintiff could nevertheless perform work as a cleaner, housekeeper, dispatcher, systems/electrical installer, or assembler (*see* tr. 1688).

Finally, the ALJ summarized the testimony provided by Dr. Jonas, the ME (tr. 18). Relevant to the issues raised in this appeal, Dr. Jonas offered opinions as to whether Plaintiff's mental health conditions met the criteria of certain listings. After concluding that Plaintiff's conditions did not

meet the criteria of Listings 12.04 (affective disorders), 12.06 (anxiety related disorders), and 12.09 (substance addition disorders), even though Plaintiff had been diagnosed with disorders in each of these categories, he considered the criteria of Listing 12.08 (personality disorders) (*see* tr. 1637–40). Dr. Jonas opined that Plaintiff's personality disorder met the "A" criteria of Listing 12.08 (i.e., "deeply ingrained, maladaptive patterns of behavior associated with" at least one of six symptoms or manifestations) (*see* tr. 1640–50; *see also* 20 C.F.R. Part 404, Subp't P, App'x 1 (Listing 12.08)). He then considered whether it met the "B" criteria of Listing 12.08 or, more specifically, whether Plaintiff had "[m]arked difficulties in maintaining social functioning"[6] (*id.*). Dr. Jonas responded as follows, "[Plaintiff is] a pretty manipulative, passive-aggressive guy. And my sense from the record is that he has contaminated a lot of his interpersonal relating. And so I think I would feel pretty confident to say that he would have a listing-level social impairment." (tr. 1667). Dr. Jonas went on to note, however, that he could not offer a definitive opinion without additional evidence, such as information concerning Plaintiff's interaction with other people during his incarceration or previous employment (*see* tr. 1667–68). Plaintiff's counsel then asked Dr. Jonas whether Plaintiff would "need to avoid interaction with coworkers and supervisors" (tr. 1668). In a lengthy and not necessarily direct response, Dr. Jonas offered several opinions, including the following: (1) Plaintiff could likely work as a surveillance systems monitor, because "that's something you more or less do by yourself," and as a dispatcher; (2) Plaintiff should not "deal with the broad general public or . . . even with co-workers or bosses in a highly cooperative way," that is, in a way Dr. Jonas characterized as involving "teamwork"; and (3) Plaintiff could deal with other people "somewhat," but he could not work in a job where dealing with people was "a central part of the task" (tr. 1669). Next, after repeating his opinion that other information about Plaintiff's employment or incarcerative history would be helpful, Dr. Jonas ultimately opined that Plaintiff should be limited to "only occasional contact with the public" (*id.*). As an example of what he meant by a job involving "occasional contact," Dr. Jonas noted that Plaintiff could work stocking shelves in a grocery store

---

[6] Dr. Jonas concluded that Plaintiff did not meet the three other "B" criteria of Listing 12.08 (marked restriction in activities of daily living; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration).

because he could tolerate questions from customers regarding the location of certain products or departments (tr. 1670).

V.    DISCUSSION

Plaintiff raises one claim in this appeal, namely, that the ALJ erred in determining his RFC (*see* doc. 13 at 5–11).  In setting forth his arguments in support of the claim, however, Plaintiff actually raises or appears to raise several sub-claims, including that the ALJ erred: (1) in rejecting Dr. Jonas' opinions and by failing to explain why he rejected his opinions; (2) in concluding that Plaintiff could perform certain jobs because those jobs require abilities beyond his RFC; and (3) in rejecting Plaintiff's testimony that he cannot maintain employment due to excessive absenteeism and tardiness and by failing to explain why he rejected this testimony (*id.* at 7–9).

Residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.  *See* Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite his limitations.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Although the RFC determination is a medical question, it is not based only on "medical" evidence, that is, evidence from medical reports or sources; rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record.  *See* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); Dykes v. Apfel, 223 F.3d 865, 866-67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding).  *See also* 20 C.F.R. § 404.1545; Social Security Ruling (SSR) 96-8p.

As previously noted, the ALJ included in Plaintiff's RFC a limitation to only occasional contact with the public.  Plaintiff contends, however, the ALJ erred by failing to also include in the RFC "some limitations in dealing with co-workers and/or supervisors" (doc. 13 at 7) (emphasis added).  He avers that Dr. Jonas testified to these limitations, and the ALJ should have included

them in the RFC or explain why he rejected Dr. Jonas' opinions. Plaintiff's contention is without merit.

Initially, Dr. Jonas did testify that Plaintiff would have some limitations in dealing with co-workers and supervisors, but he clearly explained that these limitations would preclude employment only in jobs requiring highly cooperative, teamwork-type interaction with co-workers or supervisors and where such close interaction is essential and central to job tasks. Although Dr. Jonas did not offer examples of "highly cooperative, teamwork-type" jobs that Plaintiff could not perform, he did offer examples of jobs that Plaintiff could perform, including dispatcher and surveillance system monitor. And at step four of the sequential evaluation, the ALJ found Plaintiff "not disabled" because he could return to his past relevant work as a dispatcher.[7] Next, to the extent Plaintiff contends the ALJ should have specifically included in the RFC a limitation to only occasional contact with co-workers and supervisors, he is not entitled to relief because any error in this regard is harmless. The VE confirmed during his testimony that dispatchers "very seldom have much interaction with coworkers or supervisors" (tr. 1688). Moreover, the VE specifically identified the dispatcher job as a job Plaintiff could perform when he was asked to consider a limitation to only occasional interaction with co-workers and supervisors (*see* tr. 1687–88). Thus, any error in failing to include in the RFC a limitation to only occasional interaction with co-workers and supervisors is harmless, because the VE considered the limitation and identified the dispatcher job as a job Plaintiff could perform.

With regard to Plaintiff's second contention, the VE testified that a person with Plaintiff's RFC could perform his past relevant work as a dispatcher. Plaintiff appears to argue, based on the description of "radio dispatcher" contained in the Dictionary of Occupational Titles ("DOT"), that he could not perform this job because the DOT reflects that a dispatcher job requires "dealing with

---

[7] The ALJ also found at step four that Plaintiff could return to his past work as a security systems installer (tr. 18). As the Commissioner concedes, this finding was made in error because Plaintiff performed the installation job at a medium level of exertion, and the RFC limits him to light work (*see* doc. 16 at 9). However, the error is harmless. First, it is clear that Plaintiff could perform his past work as a dispatcher, the other past work identified by the ALJ; thus, the ALJ would have reached the same decision at step four even if he had not erroneously identified the systems installer job as a job Plaintiff could perform. *See, e.g.*, Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (the harmless error inquiry involves determining "whether the ALJ would have reached the same decision denying benefits, even if he had followed the proper procedure . . . ."). Second, the ALJ made an alternate finding of "not disabled" at step five; thus, the ALJ would have found Plaintiff "not disabled" even if Plaintiff could not perform any of his past relevant work.

people and performing effectively under stress" (doc. 13 at 8 & attach.). While his argument is unclear, Plaintiff presumably contends that the DOT description of the dispatcher job is inconsistent with the limitation in his RFC to only occasional contact with the public. The court is unpersuaded. Initially, a "vocational expert is an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments." Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004). Thus, as is generally the case, the ALJ was permitted to rely on Mr. Spitznagel's expert opinion that a person with Plaintiff's RFC could perform the job of dispatcher. However, in the instant case, the ALJ could have reached the same conclusion without Mr. Spitznagel's testimony, as VE testimony is not required at step four to establish that a claimant can return to his past relevant work as long as other substantial evidence supports the ALJ's conclusion. Molina v. Barnhart, No. Civ.A. 03-CV-2039, 2004 WL 2250928, at *5 (E.D. Pa. Sept. 30, 2004) (citing Rivera v. Barnhart, 239 F. Supp. 2d 413, 420–21 (E.D. De. 2002)). See also Lewis v. Barnhart, No. 05-3-B-W, 2005 WL 1923514, at *2 (D. Me. Aug. 9, 2005) ("The case law makes clear that vocational testimony is not required at Step 4.") (citations omitted). Accordingly, the VE's testimony and expert opinions in this case—while unnecessary at step four—merely provide additional evidence in support of the ALJ's finding at step four that Plaintiff could perform his past work as a dispatcher.

Finally, with regard to the ALJ's alternative finding of "not disabled" at step five, the VE identified the jobs of housekeeper, assembler, and office helper as other jobs Plaintiff could perform with the RFC determined by the ALJ (tr. 1685). These are the same three jobs the ALJ identified at step five as other jobs Plaintiff could perform (tr. 20). The VE, however, also identified the jobs of housekeeper and assembler as jobs Plaintiff could perform with the RFC determined by the ALJ and with a limitation to only occasional interaction with co-workers and supervisors (see tr. 1687–88). Thus, the ALJ's findings at step five, at least with regard to the housekeeper and assembler jobs, would remain the same even if the RFC included a limitation to only occasional contact with co-workers and supervisors (see tr. 19–20).[8]

---

[8] Plaintiff appears to also assert that the VE was simply wrong as to the responsibilities of a housekeeper, and thus the ALJ erred at step five in concluding Plaintiff could perform this job. In support, Plaintiff has attached to his memorandum copies of "advertisements from housekeeping room attendant jobs" issued by Loews Hotels and Hyatt Place, both of which stress "teamwork" (doc. 13 at 8 & attachs.). Plaintiff's argument is unpersuasive. As previously

Thus, in summary, the ALJ's finding at step four—that Plaintiff could return to his past relevant work as a dispatcher—is consistent with Dr. Jonas' opinions and the VE's opinions, even though the VE's opinions were unnecessary at step four. Likewise, the ALJ's alternate finding at step five—that Plaintiff could perform other available work—is supported by substantial evidence on the record as a whole. Such evidence includes the jobs identified by the VE in response to questions that reflected Plaintiff's RFC (housekeeper, assembler and office helper) and to questions that limited Plaintiff to only occasional contact with co-workers and supervisors (housekeeper and assembler). Accordingly, as the ALJ's findings at step four and step five are supported by substantial evidence on the record as a whole, including the opinions of Dr. Jonas, Plaintiff is not entitled to relief on this claim.

The same is true of Plaintiff's argument regarding his complaints of sleepiness and insomnia. The ALJ specifically acknowledged these complaints in his decision (tr. 17). He then concluded that Plaintiff's complaints were not credible to the extent they conflicted with the RFC (*id.*). Although the ALJ did not specifically state he was rejecting these particular complaints, the implication is obvious since they are not included in the RFC. *See* Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) ("Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court. The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole.") (internal quotations and citations omitted). Next, the ALJ adopted and incorporated by reference the credibility findings included in his first decision (tr. 17), which

---

noted, a "vocational expert is an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments." Phillips, 357 F.3d at 1240. Moreover, the DOT job description of housekeeper does not limit the job to only hotels, as Plaintiff seems to suggest. *See* U.S. Department of Labor, DOT (4th ed. 1991), Code No. 321.137.010 (noting that housekeepers "ensure clean, orderly attractive rooms in hotels, hospitals, and similar establishments"). Thus, in short, the hotel housekeeper advertisements supplied by Plaintiff in no way undermine the VE's testimony or the ALJ's findings; nor do they affect the ALJ's additional finding at step five that Plaintiff could work as perform work as an assembler (or office helper).

findings Plaintiff does not contest.[9]  The ALJ also noted he had reviewed all of the medical evidence in Plaintiff's claims file (*id.*), which evidence includes the numerous medical records that generated the need for remand by the AC.  These records reflect that Plaintiff was sleeping well and had good vegetative function during the time frame relevant to this appeal (*see, e.g.*, tr. 1532, 1534 (Plaintiff reported to DOC staff that he slept "well" and that he slept six to seven hours nightly (on December 3 and 19, 2003)); tr. 1535, 1537 (Plaintiff reported to DOC staff that he slept "a lot" and that he slept approximately six hours nightly (on November 3 and 21, 2003)); tr. 1539 (Plaintiff reported to DOC staff that he slept seven to eight hours nightly (in October 2003)); tr. 1543 (vegetative function noted to be within normal limits by DOC staff (in September 2003)); tr. 1546 (Plaintiff reported to DOC staff that he slept six to seven hours nightly (in July 2003)); tr. 1551 (Plaintiff reported to DOC staff that he slept eight hours nightly (in June 2003)); *see also, e.g.*, tr. 1555, 1574, 1575, 1579, 1583, 1584, 1585, 1586, 1587, 1589, 1590, 1592, 1597, 1598 (similar reports and notations in DOC records made between 2003 and 2001)).[10]  The ALJ properly afforded "some weight" to these records in considering Plaintiff's credibility (*see* tr. 17).  These records, as well as the other evidence identified by the ALJ in his decisions, demonstrate that the ALJ's overall credibility findings are supported by substantial evidence on the record as a whole and should not be disturbed.

Furthermore, Plaintiff has identified no evidence in the record that substantiates his testimony as to insomnia, sleep apnea, or any other sleep-related problems, such as a diagnosis, treatment record, or CPAP prescription.  Moreover, the ALJ made no mention of any such diagnosis or treatment in his decisions, which decisions Plaintiff relies upon here.  And, the only records of which the court is aware (i.e., those from the DOC, identified *supra*) are wholly inconsistent with

---

[9] In his first decision, the ALJ discounted Plaintiff's complaints of disabling limitations for a variety of reasons, including the following: (1) no diagnostic tests substantiated an asthma condition, and Plaintiff aggravated any such condition by smoking a pack of cigarettes daily; (2) an examining psychologist described Plaintiff as manipulative with a history of alcohol and marijuana abuse; (3) Plaintiff left a treatment center when he felt he was not receiving the right care; (4) Plaintiff acted out violently in an emergency room when he was denied benzodiazepines; (5) Plaintiff's conditions responded well to medications; and (6) no physician opined that Plaintiff was disabled (tr. 73, 76–77).

[10] It should also be noted that a DOC record, dated March 14, 2007, reflects that Plaintiff had no "problems sleeping" (tr. 1343).  Although this record is dated beyond the date Plaintiff was last insured, it nevertheless is relevant because it is inconsistent with Plaintiff's complaints of continued sleep difficulties following his date last insured (*see, e.g.*, tr. 1723).

Plaintiff's testimony that he suffered from disabling sleep disorders during the time frame relevant to this appeal. What is more, the ALJ did not identify Plaintiff's insomnia or sleep apnea as medically determinable impairments, much less severe impairments, in either decision (*see* tr. 13–20, 71–78), and Plaintiff does not challenge the ALJ's failure to do so. Finally, Plaintiff's apparent failure to obtain treatment for sleep-related conditions until four or five years after his date last insured, also belie his complaints of disabling limitations during the relevant period.[11]

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 26th day of November 2012.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**

---

[11] Plaintiff testified in 2010 that "my biggest enemy is insomnia" (tr. 1677, 1678), and when the ALJ asked him if he was receiving treatment for this, Plaintiff responded by stating, "Yes, sir. I'm in an inpatient right now at the VA medical center in Lake City, Florida, for 60 to 90 days." (tr. 1679). And, specifically with regard to sleep apnea, Plaintiff testified that he made an appointment at the VA approximately two years ago (or, in or about 2008), but he could not keep the appointment and never rescheduled it.

Case No. 5:11cv313/MMP/EMT